The judges of the United States Court of Appeals for the Fourth Circuit. Our second case this morning is number 19-2075, Carmack v. the Commonwealth of Virginia. Mr. Grimes, are you there? Yes, sir. Lisa, have you with us, sir? You may proceed. Thank you. May it please the court, this is an appeal of a summary judgment order from the Western District of Virginia in a case brought under the Virginia Whistleblower Protection Act. This case should have gone to the jury for the following reasons. First, look at the termination letter which is dated January 4, 2018 and is in the joint appendix on page 18. Matlock said there that Carmack's position was abolished due to budgetary reductions or shortfall. But if you look at the defendant's answer which is in the joint appendix at page 115, paragraph 37, the defendants admitted that there was no budget shortfall at the time Carmack's employment was terminated as claimed by Matlock. In fact, there was an excess of $700,000 in general fund revenue which had been earmarked to cover staff salaries in the event of an unexpected budget reduction. For that reason alone, this case should have gone to the jury with respect to the question of causation by Matlock in writing to justify abolishing a position was false. Moreover, the position abolished was that of chief financial officer. Think about that for a moment. This agency could have no more gotten rid of the chief financial officer than this court could get rid of the clerk of court. You can't survive without those positions. And that's exactly what one of the board members said and told Matlock, look, you have a claim for retaliatory discharge. You can't get rid of the chief financial officer. What Matlock did instead was to terminate Duffy Carmack because he was a whistleblower. Over time, and this is all set forth in great detail in our reply brief, Matlock engaged in oppositional activity that ripened into participation activity which culminated with the termination of his employment. This is a classic whistleblower case, just like the Masters versus Carillion decided by this court 796 F third at 1109. And Judge King, just like Saunders versus Metropolitan Management, a panel that you sat on and I argued, and this is an unpublished decision, 2020 US Lexus at 8565. The animus was personal and Matlock spoke in terms of, quote, pulling the trigger, close quote, on Duffy Carmack and no one else. So we have- Mr. Browning, Judge Diaz here. Let me take a step back for a moment and ask you to tell me, you've made an argument with respect to proximate cause. Having read your brief, you seem to have spent most of your time complaining about whether or not an affidavit filed in a reply brief down below was appropriate and whether or not the district court made a mistake in, instead of applying state law principles of proximate causation, applying the McDonnell Douglas test for this state retaliation claim. But I couldn't find anywhere in the record where you, for that matter, the other side objected to the district court judge McDonnell Douglas. So having you waived any argument with respect to proximate cause on appeal? No, no, no Judge Diaz for this reason. At the beginning of the case on motion to dismiss, the district court stated that under Erie, it was going to apply ordinary state law concept of causation with respect to the whistleblower claim. So that's the way we prepared the case for months going forward, took all the depositions, conducted all the discovery. Then we got the opinion from the district court in August of 2019. The district court changed horses midstream and said that he was going to, that it was going to apply McDonnell Douglas, but for causation and so forth. That left us 30 days to note an appeal. So I've never had a case like this where the judge announces at the beginning of the case, the law is going to be one way. And on summary judgment, when the judge writes the opinion, he says that it's something else altogether. So no, there's, there's no waiver there from our perspective, Judge Diaz for that reason. Was there a hearing? A summary judgment hearing? There are many hearings. Right. At some point, Judge Urbanski, I think was a judge here that he had some point and sort of reveal his hand that he was in fact going to be applying McDonnell Douglas. And did you object at any point along the way? The judge did mention McDonnell Douglas at the hearing that was in May of 2019, but it almost seemed to be in passing. And remember, we already had the judge telling us early on that he was going to use state common law. Yes, he mentioned McDonnell Douglas, but he didn't say, and this is the law I'm going to apply to the facts of this case. It wasn't until we got the written opinion three months later in August, where the judge talked for 30 pages about McDonnell Douglas. So, yes, that's the answer to your question. Yes, Judge King. At page 39 of the judge's opinion, footnote 23, the court says neither party explicitly analyzes counts one or two under the McDonnell Douglas framework in their briefs. Nevertheless, it is clear that both parties assume this proof scheme applies. So, did you ever complain to the trial judge about that footnote? No, the footnote was in the summary judgment order. And look, the judge notes specifically neither party argued McDonnell Douglas. Why is that? Because the judge told us all along that he was going to decide the case under state law concepts of causation. He said it was clear to him that both sides assume that was the proof scheme that applied. That's what he said right there in that footnote 23. I have it right before. Why would that be clear to the judge when he told us one thing at the beginning of the case and this doesn't come out until the end of the case? I don't know why it'd be clear that the parties agreed to that or argued that when he, in the first sentence, said neither party argued McDonnell Douglas. So, I mean, that's one of the issues in this case. One of the issues in the case though, the judge changed the law, if you will, in the middle of the case, in our view. That's merely one issue in this case. But look, even if... You also certified to the Supreme Court of Virginia, right? We did. That has to do with this issue? It does. And that argument is very simple. I'm not going to dwell on that. The argument is there and I brought it up largely because of something that Judge Traxler said in another case. In a case of first impression, which this is, look, there's no case law, state or federal, deciding the cases under the Virginia Whistleblower Protection Act. In our view, Virginia ought to have the first shot at construing what level of causation is going to apply. And I've cited on brief and I could go over it. There are cases in Virginia that say the Supreme Court of Virginia rejects McDonnell Douglas. Why didn't you make that motion to certify to Judge Urbanski before he gave his 75-page opinion? I don't know how we would have known to do that because the judge told us to bring it up. Why wouldn't you bring it up? The only way we would have brought it up would have been post-summary judgment order. When the case is over, in our view, we have 30 days to note an appeal. But you're right. We could have, in that 30-day window, filed a motion to certify, a motion to stay the judgment, and then asked the district court to certify the case. I guess we could have done that, but we didn't. And even if we're faulted for that, any causation level you want to apply, but for, but for plus, approximate cause, causation, whether but for the sole cause for an action. Look, at some point, all that gets to be how many angels are dancing on the head of a pen, but any level of causation, this case could have gone to the jury because you have two reasons for discharge out there. Possible because Carmack was a whistleblower and possibly because of some budget issue. That case goes to a jury every single time because what Judge Urbanski did is weighed the evidence, weighed the evidence and in favor of the defendant and looked at the evidence in the light most favorable to the non-moving party and violation of Tolan versus Cotton. So in our view, choose whatever your standard that you want, the case should have gone to a jury. But our point is Judge King, that we think the Supreme Court of Virginia ought to get the first shot. If you disagree with that, I just decided under ordinary principles of causation or McDonnell Douglas, which we're asking you to do. I'm not conceding or acquiescing anything there. We think we prevail under any standard of review with respect to the question of causation. For these reasons that I was about to tell you, if you just look at the timeline in this case, it's telling and that's in our brief. And what happened was in November 2015, Carmack reminded Matlock that I'm going to state accounting policies and procedures. Matlock said immediately that he uses a needling technique to get rid of employees that he does not want. Now that's oppositional activity at the very beginning of the case. Then in December of 2015, Brooks told Matlock that she planned to retire. Matlock moved Adam Tolbert, pre-selected Adam Tolbert for that position. And Carmack said, you can't do that. You can't pre-select people into the state system. Probably the same way under civil service in the federal system. Then in January of 2016, Carmack tried to meet with Matlock to discuss the budget process for the next year. Matlock said, no, I'm not talking with you. I'm going to talk with Chris Fields, who had not worked at the center for four years. She wasn't even an employee. Then in January of 2016, Matlock started working on a process to find another volunteer to make the WTA look legitimate. Then in December of 2016, Carmack complained to Matlock about suspected fraud and abuse concerning overpayment to the case. Matlock's friends who worked in IT, who weren't actually doing any work for the center, but were getting paid, the two of them over a hundred thousand a year. Then in December of 2016, Matlock told Carmack that I don't want the case to report to you, even though there isn't Carmack's employees. Then he didn't want Carmack to approve their timesheets and that Carmack should back off all violating state policy and procedure. This goes on and on. Then Carmack, in February of 2017, complains to the Ombudsman at UVA. They have HR oversight for the center. The next morning, Carmack- This is Judge Gallagher. Sorry, I want to interrupt with a question on a little bit of a different point. You mentioned that you were denied the opportunity to depose Mr. Maul, the true author of the memoranda. Where in the record did you ask to depose Mr. Maul even during the period after the sanctions had been granted? Yes, Judge Gallagher, we didn't file a motion. I don't want to tell you wrong about this. I think we asked to depose Maul and complained that we're not able to do so. This is the Rule 37 issue. After discovery closed, there was a document dumped by the defense of 2,500 documents, including the Reagan memoranda from the governor's office. That's the August and September 2016 memoranda that talked about a 5% budget reduction to state agencies that are not institutes of higher learning. That's when we asked to depose Paul Reagan. The judge let us do that. Reagan said, look, we're not aware in the governor's office that this 5% reduction would the loss of any personnel, much less the chief financial officer of the center. Then we also asked to depose Maul. I can't tell you right now, Judge Gallagher, where that is in the record, but the judge said, no, I'm not letting you depose Maul. If that was one of the arguments on appeal, shouldn't it be in the record somewhere? I didn't see it anywhere in the the records, 2,500 pages. On my break, I'll go back and try to find it, but I can't point it to you. I can't point you to it right now. The point is the defense did a document dump under Rule 37. There's no discretion with the district court. Rule 37 says when that occurs, the defense does not get to use those documents, does not get to use that Matlock affidavit or any of those 2,500 documents. The district court overlooked that and let them use it anyway. That became the linchpin by the defense, and that's why they didn't do it. They never gave it to us before. That became the linchpin for their argument concerning termination until we took Matlock's deposition. He said that memorandum played a small part, a very small part, in the decision to terminate Matlock, thus undercutting all efforts by the defense with respect to that document dump. For all those reasons, we think the case should have gone to the jury. For other reasons as well, DHRM did not approve the WTA plan until six months after Duffy Carmack was terminated. That was all a smokescreen. The other two employees, the women, Brooks and Williams, they planned for two years to retire, and that is in the record. This wound up costing the state more money because it provided an enhanced retirement package to them. In addition, under this WTA plan, you're supposed to try to find another job for Carmack, and you're supposed to call him back after some period of time. We're going on three years. He's never been called back. I fall back on the pull the trigger language. What Matlock did is he said, I'm going to pull the trigger on Duffy Carmack. That's a telling metaphor. That's an execution within the employment context, because he was a whistleblower. For all these reasons, we think the case should have gone to a jury. I see that I'm running out of my time, so I'll stand down and wait for the questions. I'll look for that question that you asked me, Judge Gallagher, while I'm standing down here. Thank you, Mr. Grimes. Do you have some rebuttal time? Yes, sir. Mr. Hardy? Mr. Hardy, are you with us? Yes, Your Honor. May it please the court, my name is Ryan Hardy, and I'm here on behalf of the FLEs, the Commonwealth of Virginia, the Southwest Virginia Higher Education Center, and David Matlock. This appeal involves two applications of the McDonald-Douglas framework to dismiss Carmack's Virginia statutory wrongful discharge claim and a district court refusal to strike a second declaration by Michael Maul of the Department of Planning and Budget. Turning first to Maul's declaration, because a 2,500-page document dumped that occurred after the close of discovery, the disclosure of those documents occurred prior to the close of discovery. Yes, two memorandums and approximately 10 other pages worth of documents were produced after the close of discovery. It was inadvertent, but the district court granted the plaintiff's discovery sanctions and at no point did Carmack ask to depose individuals. He did not ask to depose Michael Maul. He did not ask to redepose other individuals. He just wanted to strike evidence completely, and in face of that, the district court split the baby in a sense and allowed him to depose people they had deposed previously and to allow the deposition of Paul Reagan. There was never a request to depose Paul Reagan. There was never a request to depose Michael Maul. What counsel is trying to do is turn this back to relitigating the sanctions motion. We're here to discuss the decision to not strike Michael Maul's declaration, and that is reviewed under the deferential abuse of discretion standard. This deference to the judgment is heightened in this case because there are few, if any, bright-line rules governing the adequacy of initial disclosures. The 1993 advisory committee notes explain that Rule 26A1 simply requires a litigant to indicate briefly the general topics on which such persons have information, and that is where Carmack's challenge fails because the district court has rejected each of the arguments that he makes now. The district court held that Maul's second declaration fell squarely within the subject matter contained in the commonwealth's initial disclosure and subsequent discovery production. Maul was identified as an individual whom Madlock told that he would be submitting a workforce transition act request later in the year, and that the CFO position was one of the positions planned for elimination. The commonwealth produced documents along with this initial disclosure that put Carmack on notice that Maul had relevant information. This included the request for approval from the department of planning and budget for the reorganization proposal, and specifically mentioned the budget reductions enacted in the appropriations act, and explained that the layoffs were due to budgetary shortfalls in the commonwealth for fiscal years 2017 and 2018, and this can be found on page 387 in the joint appendix. Mr. Hardy, Judge Diaz here. Excuse me. Your friend on the other side suggests, and you may be about to get to this, but I wanted to ask it now, that everybody was surprised by Judge Hrabanski's use of the McDonnell-Douglas test in his summary judgment order. It appeared, at least he represents, that early on Judge Hrabanski indicated that eerie principles would apply, I guess the implication being that because McDonnell-Douglas is a matter of substantive law, and that's a question that I guess is not slammed down, that there's some question about that, but I guess the assumption is because McDonnell-Douglas was a, that test is a matter of applying substantive law, that instead that the typical elements of proximate causation should apply in this case. Were you, was the commonwealth surprised by Judge Hrabanski's use of McDonnell-Douglas in this case? No, your honor, because we specifically invoked the legitimate business defense prong of the not differentiate between the whistleblower act or the first amendment. And then, and this is in docket number 64 at 21, I'm referring to the summary judgment pleadings, ECF number 64 at page 21, ECF number 72 on pages 10 through 13, uh, and that is Carmack's, uh, opposition to summary judgment. Our reply brief at, uh, ECF number 74 at 11, the supplemental pleading ECF number 100 at page one and ECF number 102 at four. That's the pleadings assumed exactly what Judge Hrabanski said in that footnote that the McDonnell-Douglas legitimate business reason analysis applied to both claims. And in fact, on page 1909, uh, this is the transcript from the summary judgment hearing, uh, counsel for Carmack said, our first argument is based on the fact that there was no legitimate business interest needs for the reduction. So Carmack himself invoked the McDonnell-Douglas analysis. And that is why as this, uh, as the panel was questioning earlier, the issue is waived under either the forfeited error analysis under Alano or the invited error analysis and invited error that you only need to have a tacit agreement in order to be precluded from F3D126. The parties, uh, agreed that the court could, that the jury could use the courtroom to deliberate. And there happened to be a model airplane that the, uh, that the council had used as a demonstrative exhibit. And a juror, jury member happened to use it as during the deliberations and it's tendered a verdict for the plaintiff. The defendant appealed, uh, claiming that it was error for the, for the district court to allow that model airplane to be in the courtroom. But this court rejected that and said that the defendant knew the model had been left in the courtroom and should have objected when they had the chance. That is exactly what happened here. Every time that the Commonwealth cited legitimate business reason analysis, that should have put Carmack on notice that I need to make this eerie challenge. And when the district court held and the motion to dismiss stage, when he invoked Erie, that was only for the substantive components of the whistleblower act. He did not say that the Don Douglas was a procedural or a substantive law because at this course where the Erie doctrine says that when a federal court has pending jurisdiction over a state claim, state substantive law is applied and federal procedural law is applied. Can I ask you, thank you for that response to my question, but let me talk about the record a little bit because your colleague on the other side spends a lot of time talking about what Mr. Carmack had done while he was still engaged the CFO and pointing out various issues and deficiencies and what he alleged to have been unlawful activity by Matlock during the course of his work. And he says that all of that amounted to oppositional activity, which shows that this work production decision made by you and not you directly, but by Mr. Matlock and the Commonwealth was all just a pretext for getting rid of someone who was engaged in oppositional activity. But as I understand it, the record in this case shows that the earliest date at which Matlock knew of Carmack's complaint as a whistleblower was in October of 2017. I think October the 16th of 2017. So can you explain to me how, if at all, were to consider the oppositional activity as relevant to the question of pretext, given that date, that operative date in the record is the date on which Mr. Matlock actually knew of the whistleblower complaint? Yes, Your Honor. The timeline is actually fatal to Carmack's claim as it relates to causation because the first time that David Matlock notified another agency, the University of Virginia, of his intent to abolish Carmack's position was November 8, 2016. This can be found on page 157 of the appendix. And this, of course, predates the October 2017 date in which Carmack alleges Matlock learned about his complaint to the Office of State Inspector General. That 11-month gap is fatal as a matter of law. Okay, so your friend on the other side says you can't just look at that in isolation. You need to look at all the, as he described it, characterized it, oppositional activity that Carmack was engaged in and pointing out all these problems that were occurring in the workplace with respect to Matlock's daily work activities, the allegedly unlawful activity that was taking place. So how are we supposed to consider that? Well, those oppositional activities do not amount to actual protected activity under the Whistleblower Protected Act. The November 15th warning that Carmack intended to follow the rules, that's not actually highlighting an instance of fraud, waste, or abuse. That can be found on page 638 and 639. The concerns in December 2015 and January 2016 about pre-selecting Adam Tolbert, again, that occurred well before, 16 months, 11 months before, Carmack or Matlock indicated his intent to, or at least looking at Carmack's position to be abolished. I guess so that same temporal issue arises there. And that can be found on page 650, 651, and 1718 of the appendix. And then finally, there's the September 2016 concern about pre-selecting Joe Mitchell to be facility manager. That is more of a personnel issue and not a type of fraud, waste, or abuse. And the record demonstrates that Carmack knew that Mitchell had actually applied for that position on page 695 through 697. And finally, as a point of, I might have misunderstood counsel, but the reference to the overtime payments to an IT couple, there was some confusion about the timing of when or when Carmack made his complaint. At the summary judgment motion, and he initially filed a declaration saying it occurred, he made the complaint December 2015. Then on summary judgment, he asked to be put under oath and he was questioned by his counsel. And he said, no, what I meant was December 2016. So either way, the same temporal problem arises. It's either occurred way too early, 11 months before Matlock decided to look into abolishing Carmack's position, or it occurs after. So either way, it does not help Carmack. And Mr. Hardy, let me ask you about this in the record and ask you to comment on it. Because I understand the record, once Mr. Matlock received word of the need to make these reductions in budgets, that he and Carmack worked together and actually put together a budget that complies with the commonwealth's requirements for a budget reduction without having to eliminate anybody from the workforce. For some reason, unexplained reason not in the record, maybe you can explain it. Maybe I just haven't found it. That budget was withdrawn. And then this new budget is put in place that actually requires a workforce reduction. On the face of it, that seems a little bit squirrely, maybe suspicious. So what about that? Absolutely, your honor. And it does help into the small parts issue that counsel mentioned earlier. So first, Matlock received the August budget reduction memo that said we're having budget reductions for fiscal year 2017. Plans are due in early September. And that's when Carmack submitted that budget. And everything was fine. And then the second budget reduction memo came in on September 26, 2016. And that, as Matlock testified, that is what frightened him. Because now they're having an additional year of a budget reduction for fiscal year 2018. So he's not just looking at one budget reduction for one fiscal year, he's looking at for two, possibly more. So that's when he has to start looking into what are some, what can we do for the center? Because he's identified that, you know, in order to remain viable, the marketing position that Carmack has proposed eliminating, that was needed. And so the timeline syncs up. Because then he goes in, he starts crunching the numbers. And this is in November 2016 to February 2017. And in February, he goes to Michael Maul and asks him, did, I know that there was already a budget submitted, am I precluded from, you know, changing things up a bit? And Michael Maul said, no, the General Assembly did not specifically dictate how you were to apply the budget reductions. Therefore, it remains within your discretion. And so this is where the D.J. Arnett line of cases comes in. And this becomes the managerial prerogative. And so you get, when you get, when Matlock received the second budget reduction memo, that's what changed his mind. And created the need to look at other options. And he was able to create a budget reduction plan. It eliminated three positions. But in his view, it helped establish the position of the center to be more efficient and effective going forward. And to Council's point that you can't survive without a CFO, the center is still alive. It's doing very well. It has managed to weather the pandemic and the further budget crunches quite well. So that alone is not enough to say that a CFO must be necessary. And the federal courts are not in a position to second guess those business decisions. And finally, I do want to point out, I was flipping through Council's reply brief with this court. And on page 23, he does cite to Reed, the Sanderson plumbing, and he cites other cases that use the pretext McDonnell Douglas language. So that would seem like even though he believes that the pretext is not the right one, he announces applies with equal force. And ultimately, when we're talking about causation, the issue here really is did the court err in applying McDonnell Douglas? And if that issue is waived, either through forfeited error or invited error, then the causation component becomes unnecessary. And in fact, it is unnecessary to even look at this because McDonnell Douglas does apply here because the case law, even though the Fourth Circuit has not definitively ruled, there's enough there to say that it is a procedural law that should be applied in any state discrimination claim unless there's some substantive component of the statute compels a different result. And the McDonnell Douglas framework doesn't have any of the makings of a substantive law as the Supreme Court has defined in Hanna v. Plumer. It does not change the ultimate burden of proof. That is something that this court has said multiple times in Brinkley and Enos. And the Supreme Court itself has said that McDonnell Douglas is a procedural device designed only to establish an order of proof and production. That's St. Mary's Honor Center v. Hicks, 380 U.S. 460. So if the court, district court, does not err in applying a procedural component of Rule 56, and so long as the legitimate business reason analysis applies, then Carmack's claim must fail on that point. And it's our argument that that challenge has been waived through invited error and forfeited error. And I finally want to have a couple other points on Michael Maul. This is a very differential standard of review. And as I mentioned earlier, there was not a 2,500-page document dumped after the close of discovery. That occurred prior. Hicks Council is completing two different things. And I laid this all out in a declaration that I submitted to the district court that can be found on ECF number 75-1. And then the final point, and the final point, and the document production, in this case, puts Carmack, spoiler alert, knows that a statewide budget reduction was the reason for the elimination of his position. So this concept that there was no budget shortfall within the center is a red herring, and the district court properly rejected it. And unless the court has any other questions, I thank you for your time. And Carmack has not presented any basis to reverse the district court's order. Thank you. Mr. Gallagher, do you have anything further? I do not. Mr. DeHaas? No, thank you, Judge King. Thank you, Mr. Harding. We appreciate it. Mr. Grimes? All right. First, with respect to counsel's argument that oppositional activity is not actionable under the Virginia Whistleblower Protection Act. I don't know where he gets that, because it's certainly actionable according to Crawford v. Metropolitan Government of Nashville, the Supreme Court case. And this court's decision in DeMasters v. Carillion, and it's as common as rain for oppositional activity to precede participation activity. Turning to your question, Judge Gallagher, I did find an answer for you. I think the answer is in the negative. We did file a motion to strike the defense declaration of Mull, and that's in the record below at document 103, and our reply brief at document 105. Also, our reply brief to the motion for sanctions at document 76, but we answer your question in the negative. But how would we know that Mull ghost wrote the Reagan memoranda until we took the deposition of Paul Reagan? So we had no need to depose Mull until we learned that he ghost wrote the Reagan memoranda when we took his post-summary judgment deposition. So, in conclusion, we're left with the fact that Matt Watkins said, I'm going to pull the trigger on Duffy Carmack and no one else. And he said he's never said that with respect to any other employee. That's evidence of personal animus. Judge Diaz, your point, I think, is well taken. With respect to the budget issue, Carmack, as the CFO, he solved the budget problem without the loss of any employees, and then Matlock turned it around and said, no, I'm going to work up another budget that gets rid of you, Duffy Carmack. That's personal animus. It ought to be actionable under Virginia Code Section 2.2-3011, which is the Virginia Whistleblower Protection Act. I'll answer any questions that you may have. If not, I'll stand down. Anything further, Judge Gallagher? No, thank you. Judge Diaz? No, thank you. Thank you very much, Mr. Grimes. This case will be submitted. Madam Clerk, it would be a good time for another break. The court will take a brief break before hearing the next case. Thank you.
judges: Robert B. King, Albert Diaz, Stephanie A. Gallagher